## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JESSICA HELENIUS,                          )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )
                                           )   Case No. 2:23-cv-01187-SGC
COMMISSIONER, SOCIAL                       )
SECURITY ADMINISTRATION,                   )
                                           )
            Defendant.                     )

### MEMORANDUM OPINION[1]

The plaintiff, Jessica Helenius, appeals from the decision of the
Commissioner of the Social Security Administration (the "Commissioner")
denying her application for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). (Doc. 1).[2] Helenius timely pursued and
exhausted her administrative remedies, and the Commissioner's decision is ripe for
review pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3). For the reasons discussed
below, the Commissioner's decision is due to be reversed and remanded.

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge
pursuant to 28 U.S.C. § 636(c). (Doc. 16).

[2] Citations to the record in this case refer to the document and page numbers assigned by the
court's CM/ECF document management system and appear in the following format: (Doc. __ at
__). Citations to the administrative record (Doc. 8) refer to the page numbers assigned by the
Commissioner and appear in the following format: (Tr. at __).

## I. Background

### A. Statutory and Regulatory Framework

To establish eligibility for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). A claimant must also show she was disabled between her alleged onset disability date and her date last insured. *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 831 (11th Cir. 2011) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979)). The Social Security Administration ("SSA") follows a five-step analysis to determine whether an individual is eligible for disability benefits:

1. The Commissioner determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; otherwise, the Commissioner proceeds to the second step.

2. The Commissioner then determines whether the claimant suffers from a severe physical or mental impairment or combination of impairments that has lasted or is expected to last for a continuous period of at least twelve months. If there is no severe impairment, the claimant is not disabled; otherwise, the Commissioner proceeds to the third step.

3. Next, the Commissioner determines whether the Step 2 impairment meets or equals one of the "Listings" found in 20 C.F.R. Part 404, Subpart P,

Appendix 1. If so, the claimant is disabled and the claim is granted; otherwise, the Commissioner determines the claimant's residual functional capacity ("RFC") and then proceeds to the fourth step.

4. The Commissioner then compares the claimant's RFC with the mental and physical demands of the claimant's past relevant work. If the claimant can perform past relevant work, the claimant is not disabled; otherwise, the Commissioner proceeds to the final step.

5. At the fifth step, the Commissioner determines whether the claimant can perform any other work that exists in substantial numbers in the national economy in light of the claimant's RFC, age, education, and work experience. If so, the claimant is not disabled, and the claim is denied. If not, the claimant is disabled, and the claim is granted.

*See* 20 C.F.R. §§ 404.1520(a), 404.1520(b), 416.920(a), 416.920(b) (Step 1); 20 C.F.R. §§ 404.1520(c), 416.920(c) (Step 2); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926 (Step 3); 20 C.F.R. §§ 404.1520(e-f), 416.920(e-f) (Step 4); 20 C.F.R. §§ 404.1520(g), 416.920(g) (Step 5).

**B. The ALJ's Decision**

Helenius applied for benefits in July 2019, claiming she became disabled on December 1, 2007, when she was 24 years old. (Tr. at 24; 312). Her application was denied, and she requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 85, 121, 175). At the December 2022 hearing, Helenius testified she suffers from depression, bipolar disorder, schizoaffective disorder, attention deficit hyperactivity disorder ("ADHD"), and anxiety. (*Id.* at 52). She lives with her parents, who are retired. (*Id.* at 49). She last worked part-time in 2008 as a cashier at a health food store but left that job because it was hard to deal with

negativity and, while working there, she had racing thoughts and anxiety. (*Id.* at 53). Helenius was hospitalized for her mental state in 2009 and 2010. (*Id.* at 55). She does not think she can hold a job outside her home. (*Id.* at 57). Every time she has worked, Helenius has had a manic episode. (*Id.* at 59). She prefers to stay home where she reads, listens to music, and helps her mother around the house. (*Id.* at 58). She does not drive, but she goes out with her mother. (*Id.* at 49-50, 58).

Helenius's mother, Laura Helenius, also testified at the hearing. (*Id.* at 65). Laura testified that Helenius helps around the house but does not finish tasks and needs reminders to complete her chores. (*Id.*). Laura and her husband give Helenius an allowance; Helenius has a credit card, and she will give her father money to pay the card's balance. (*Id.* at 68). Helenius does not require help taking medicine. (*Id.* at 69). Although she wants Helenius to have a job or life outside the home, Laura believes Helenius cannot sustain full-time, repetitive work; when Laura discussed it with Helenius's psychiatrist, the doctor said not to "rock the boat" because Helenius is doing "great" but stress might affect that. (*Id.* at 69-70). Helenius meets with her psychiatrist every four months and has had no indication of psychosis, breaks from reality, or other schizoaffective symptoms for at least five years. (*Id.* at 71-72).

Following the hearing, the ALJ denied Helenius's claim. (*Id.* at 24-35). The ALJ first found Helenius met the SSA's insured requirements through September

11, 2011, and did not engage in substantial gainful activity after the alleged onset date of December 1, 2007. (*Id.* at 26). At the second step, the ALJ determined Helenius had the following severe impairments: ADHD, depression, bipolar disorder, schizoaffective disorder, and anxiety disorder. (*Id.*).

At the third step, the ALJ determined Helenius's mental impairments did not meet or medically equal the severity of one of the Listings. (*Id.* at 27). The ALJ found Helenius had (1) a moderate limitation in understanding, remembering, or applying information; and (2) a moderate limitation in interacting with others, concentrating, persisting, maintaining pace, and adapting or managing herself. (*Id.* at 28). Because Helenius's mental impairments did not cause at least two marked limitations or one extreme limitation, they did not meet the "Paragraph B" criteria. (*Id.* at 29). Nevertheless, the ALJ accounted for Helenius's mild and moderate mental limitations when assessing her RFC. (*Id.*).

Before proceeding to the fourth step, the ALJ found Helenius's impairments could reasonably be expected to cause some of her alleged symptoms and functional limitations but her statements about the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.* at 30). The ALJ determined Helenius had the following RFC:

> [Helenius can] perform a full range of work at all exertional levels but with the following nonexertional limitations: cannot climb ladders,

ropes, or scaffolds; cannot be exposed to workplace hazards such as moving mechanical parts and high, exposed places; can understand, remember, and carry out simple instructions; cannot perform work requiring a specific production rate, such as assembly line work, or work that requires hourly quotas; can tolerate no interaction with the public, but occasional interaction with coworkers and supervisors; and can deal with occasional changes in the work setting.

(*Id.* at 29). The ALJ concluded that Helenius's treatment records and diagnostic imaging did not indicate that her impairments resulted in disabling functional limitations. (*Id.* at 30). From 2016 through 2019, Helenius reported she was "doing well" with her symptoms and had no depressed mood. (*Id.* at 31). In March 2019, when she established care at the Kirklin Clinic, she reported no symptoms and had an unremarkable and normal physical examination. (*Id.*). Throughout 2019, 2020, and 2021, Helenius reported she was stable, "doing well," or "doing good" during follow-up medical visits. (*Id.*). In August 2022, she denied depression; had good interest and motivation; reported no mania, panic attacks, problems with focus, hallucinations, or suicidal thoughts; had good energy; and did not have much anxiety. (*Id.*). Accordingly, the ALJ concluded that although Helenius's daily activities and reported functioning did not support disabling mental limitations, they did indicate some mental limitations as reflected in the RFC. (*Id.*).

The ALJ also concluded that while the objective medical evidence reflected a difficult period roughly fifteen years prior, recent evidence did not support a finding of total disability. (*Id.*). He assessed significant mental restrictions,

including social restrictions, but he concluded Helenius could perform unskilled work. (*Id.*). He also accounted for the type, dosage, effectiveness, and side effects of Helenius's medications when determining her RFC, restricting her ability to climb and be exposed to moving mechanical parts and high exposed places because of the potential effects of those medications. (*Id.*).

The ALJ found mostly persuasive the opinions of the state agency consultants, Dr. Robert Bare and Dr. Robert Estock, that Helenius had only moderate mental limitations because their opinions were generally consistent with Helenius's symptoms, daily activities, self-reported level of functioning, and the objective medical evidence that demonstrated she had intact cognition, no psychotic thoughts, adequate judgment and insight, and intact memory. (*Id.* at 32).

The ALJ found unpersuasive Dr. Robert Storjohann's opinion that Helenius had marked deficits in her ability to understand, carry out, remember instructions, and respond appropriately to supervision, coworkers, and work pressures in a work setting because the opinion was inconsistent with Helenius's function report where she stated her impairments did not affect her ability to complete tasks, concentrate, understand, or get along with others. (*Id.* at 32). He also found Dr. Storjohann's opinion internally inconsistent because Helenius's symptoms did not match or support the extreme findings, which called into question the entire report. More specifically, the supposed marked deficits were inconsistent with Dr. Storjohann's

report that Helenius performed simple addition, subtraction, multiplication, and division; correctly counted from twenty to one; spelled the word "world" forward and backward correctly; performed serial sevens with only two errors; recited six digits forward and three digits backward; recalled two of three objects after a five minute delay; had logical, coherent, and goal-directed thoughts and speech; had no hallucinations or delusions; and had average intelligence. (*Id.*). Also, the treatment Helenius received did not support Dr. Storjohann's extreme conclusions. (*Id.*).

The ALJ did not consider Dr. Jane Daw's frequent notes that Helenius was "not able to sustain employment" because such a statement is a conclusion on the ultimate fact that is reserved to the Commissioner and it is evidence that is inherently neither valuable nor persuasive pursuant to 20 CFR §§ 404.1520b(c)(3) and 416.920b(c)(3). (*Id.* at 32). He did, however, consider the body of evidence from Dr. Daw in determining Helenius's RFC. (*Id.*).

At the fourth step, the ALJ found Helenius could not perform any of her past relevant work as a cashier because the vocational expert ("VE") testified that based on Helenius's age, education, and RFC, she would not be able to perform her past work. (*Id.* at 33). Proceeding to the final step, the ALJ concluded that Helenius was a younger individual on the alleged disability onset date. (*Id.*). She had at least a high school education, but transferable skills were not an issue because her past relevant work was unskilled. (*Id*.). Finally, the ALJ concluded that based on

Helenius's RFC, there were a significant number of jobs in the national economy she could perform, including photocopy machine operator (approximately 10,000 jobs), housekeeping cleaner (approximately 221,000 jobs), and kitchen helper (approximately 281,000 jobs). (*Id.* at 34). Based on this evidence, the ALJ ultimately concluded Helenius was not disabled since the date she filed her application and therefore was not entitled to benefits. (*Id.*).

The Appeals Council denied review of the ALJ's decision, and that decision became the final decision of the Commissioner. (*Id.* at 8); *see Fry v. Massanari*, 209 F. Supp. 2d 1246, 1251 (N.D. Ala. 2001) (citing *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998)). Thereafter, Helenius filed this action. (Doc. 1).

## II. Standard of Review

A court's role in reviewing claims brought under the Social Security Act is narrow. Its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner and (2) whether the correct legal standards were applied. *See Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r Of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). A court defers to the factual findings of the Commissioner, provided those findings are supported by substantial evidence, but closely scrutinizes the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). A district court reviews the Commissioner's

legal conclusions *de novo*. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993).

"The [Commissioner's] failure to apply the correct law or to provide the reviewing

court with sufficient reasoning for determining that the proper legal analysis has

been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46

(11th Cir. 1991).

## III.    Analysis

Helenius brings two challenges to the ALJ's decision. First, she contends the

ALJ failed to properly explain how he reconciled an alleged conflict between the

RFC and Dr. Bare's opinion. Second, she argues the ALJ failed to ask the VE to

resolve an apparent conflict between the VE's testimony and the DOT guidelines.

### A. Conflict between RFC and Dr. Bare's opinion

In Dr. Bare's opinion, Helenius was not significantly limited in her ability to

maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness. (Tr. at 99). In a note to this finding, he stated: "Feedback should

be supportive, encouraging, respectful, calm, tactful, and non-confrontational." (*Id.*

at 99-100). Dr. Estock's opinion was identical. (*Id.* at 135). Despite finding both

opinions mostly persuasive, the ALJ did not specifically limit Helnius's RFC to

receipt of feedback that is supportive, encouraging, respectful, calm, tactful, and

non-confrontational. According to Helenius, the ALJ's failure to explain why he

omitted this limitation results in a conflict between the medical reports and the

RFC because frequent supervision would eliminate competitive work. (Doc. 10 at 11). In response, the Commissioner argues the ALJ is not required to defer to any medical opinion or administrative finding, nor must he adopt every part of an opinion he finds persuasive.

In support of her position, Helenius cites *Weidlich v. Comm'r of Soc. Sec.*, No. 22-13309, 2023 WL 8015753 (11th Cir. Nov. 20, 2023). In *Weidlich*, the ALJ found generally persuasive the opinion of Dr. McCliman, who opined that Weidlich "could never lift more than 10 pounds." Despite this assessment, the ALJ found that Weidlich could perform light work, which involves lifting up to 20 pounds. Because the ALJ did not provide a clear explanation for not adopting Dr. McCliman's specific limitation and because the RFC conflicted with that opinion, the Eleventh Circuit found the ALJ committed reversible error. *Id.* at *2.

The Commissioner cites *Matos v. Comm'r of Soc. Sec.*, No. 21-11764, 2022 WL 97144 (11th Cir. Jan. 10, 2022). There, Matos argued the ALJ's RFC finding was problematic because, much like here, the state agency psychologists noted that Matos "may need support with planning and goal setting" but the ALJ did not include that limitation in the RFC or explain why he omitted this limitation. Nevertheless, the Eleventh Circuit found the RFC was supported by substantial evidence because (1) the state psychologists had opined that Matos was no more than moderately limited with respect to concentration, persistence, ability to

interact socially, and ability to adapt and (2) the ALJ's decision limited Matos's social interaction to "occasional" interaction with others. *Id.*

Helenius tries to distinguish *Matos* because there, the supposed limitation was "may need support with planning and goal setting." The issue here—how to approach feedback—is more analogous to the one in *Matos* than that in *Weidlich*, which involved a direct conflict regarding the amount of weight Weidlich could lift. Moreover, the court is not convinced that supportive feedback is truly a limitation as much as a suggestion on interaction; as noted above, this "limitation" is a note to a finding that Helenius is not significantly limited in her ability to maintain socially appropriate behavior. Moreover, Helenius does not explain why this suggestion regarding feedback means she requires frequent supervision, especially given that it appears to relate to a finding of no significant limitation. In any event, like in *Matos*, the ALJ adopted the state psychologist's opinions that Helenius was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, and he accounted for this finding when fashioning an RFC limiting her to occasional interaction with supervisors. (Tr. at 29). Accordingly, the RFC set forth by the ALJ was supported by substantial evidence.

**B. Conflict between VE's testimony and the DOT**

The Dictionary of Occupational Titles ("DOT"), published by the Department of Labor, describes thousands of jobs available in the national economy and is used by the Commissioner to determine whether applicants are entitled to benefits. *See Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1311 (11th Cir. 2021) (citing 20 C.F.R. § 416.966(d)(1)). In *Viverette*, the VE identified three potential jobs for the applicant: document preparer (about 104,000 jobs nationally), final assembler (about 7,000 jobs nationally), and check weigher (about 14,000 jobs nationally), for a total of approximately 125,000 jobs that existed in the national economy. *Id.* at 1313. The Eleventh Circuit determined there was an apparent conflict between the RFC and the requirements of document preparer, thereby eliminating those 104,000 jobs from the evidence considered by the ALJ when finding that Viverette could perform significant numbers of jobs that existed in the national economy. The court stated:

> Given that over eighty percent of the jobs presented to the ALJ are affected by the apparent conflict and that we are reviewing the decision of the ALJ (on behalf of the Commissioner) for substantial evidence, we are hesitant to make any factual determinations ourselves about whether the final assembler or check weigher positions exist in significant numbers in the national economy. Where additional (or more specific) agency fact-finding is needed, remand is the appropriate disposition.

*Id.* at 1318.

Here, Helenius argues the ALJ erred because he did not ask about and resolve an apparent conflict between the RFC, which prohibits Helenius from interacting with the public, and two of the jobs identified by the VE. Per the DOT, a housekeeper "renders personal assistance to patrons" and a photocopy machine operator "may receive payment for duplicate copies." DOT §§ 323.687-014, 207.685-014. Helenius argues that both descriptions contemplate these jobs interacting with the public.

In response, the Commissioner argues there is no apparent conflict because (1) the DOT does not state that a job requires an employee to perform all the duties listed, (2) for housekeepers, the DOT describes the "people" section as "not significant," and (3) Helenius's argument regarding photocopy machine operators is speculative because such operators only "may" receive payment, which may or may not involve interacting with the public.

The court agrees the DOT descriptions for housekeepers and photocopy machine operators appear to contemplate interaction with the public; thus, there is an apparent conflict between Helenius's RFC, prohibiting her from interacting with the public, and the DOT's job descriptions for housekeepers and photocopy machine operators.[3] As noted in *Viverette*, however, an apparent conflict "does not

---

[3] *See, e.g., Kimberly T. v. Comm'r of Soc. Sec.*, 2021 WL 4843639 at *5 (D. N.J. Oct. 18, 2021) (observing that the DOT description for housekeeper contemplates interaction with the public).

14

mean that there is an actual conflict," only that "the ALJ is required to address the apparent conflict and provide a reasonable explanation for her determination." 13 F.4th at 1317. Here, the ALJ stated:

> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the [DOT . . .]. **When asked if there were any discrepancies in their testimony and the [DOT]**, or the associated selected characteristics of occupations, **the [VE] testified that the areas of** time off task, absenteeism in the workplace, concentration, and **interaction with others**, **were based on their training and experience**, as shown in Exhibit B21E, **in addition to the DOT**. The vocational expert constructed her testimony, based upon these factors, to address the more specific limitations provided above, and presented representative examples of jobs that can be performed within these limitations. **Consequently, her opinions are not inconsistent, but are only more precise**.

(Tr. at 34 (emphasis added)). Neither Helenius nor the Commissioner address whether the ALJ's determination that the VE's testimony did not contradict the DOT, but was "more precise," satisfies the ALJ's duty to reconcile the apparent conflicts. Absent some authority holding otherwise, the court interprets *Viverette* to require the ALJ to more directly address the apparent conflict rather than rely on the VE's vague testimony about any conflicts that may exist.

Finally, Helenius argues the ALJ's failure to address the apparent conflict was not harmless. In *Viverette*, excluding the conflicted job eliminated more than 80% of the available jobs, reducing the number of available jobs from 125,000 to 11,000. Here, eliminating the housekeeping and copy machine operators eliminates

45% of the jobs, reducing the number of nationally available jobs to 281,000. While these numbers are markedly different from those in *Viverette*, the Commissioner does not address this argument or provide the court with any authority to conclude that the ALJ's error was harmless and his conclusion that Helenius could perform significant number of jobs in the national economy was supported by substantial evidence. The Commissioner's failure to address this argument indicates waiver. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) (arguments not properly represented in a party's initial brief are deemed waived). Further, in the absence of authority holding otherwise, this court declines to make any factual determination about the number of jobs that qualifies as "significant." *See Viverette*, 13 F.4th at 1318. Accordingly, the ALJ's decision that Helenius could perform a significant number of jobs in the national economy was not supported by substantial evidence.

## IV.   Conclusion

Upon review of the administrative record and considering all Helenius's arguments, the court finds the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is due to be reversed and remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

A separate order will be entered.

**DONE** this 19th day of September, 2024.

_____
STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE